TRACY L. WILKISON
Acting United States Attorney
CHRISTOPHER D. GRIGG
Assistant United States Attorney
Chief, National Security Division
LAUREN RESTREPO (Cal. Bar No. 319873)
Assistant United States Attorney
Cyber & Intellectual Property Crimes Section
 1500 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-3825
 Facsimile: (213) 894-0141
 E-mail: lauren.restrepo@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>SAMUEL TRELAWNEY HUGHES,<br><br>   Defendant. | No. CR 20-332-DSF<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT SAMUEL TRELAWNEY HUGHES; DECLARATION OF SABRINA FERGUSON; EXHIBITS<br><br>Hearing Date: November 15, 2021<br>Hearing Time: 8:30 a.m.<br>Location: Courtroom of the<br>     Hon. Dale S. Fischer |

 Plaintiff United States of America, by and through its counsel of record, the Acting United States Attorney for the Central District of California and Assistant United States Attorney Lauren Restrepo, hereby files its Sentencing Position for defendant Samuel Trelawney Hughes in the above-captioned case.

 The Government's Sentencing Position is based upon the attached memorandum of points and authorities, the declaration of FBI Special Agent Sabrina Ferguson and accompanying exhibits, the files and

records in this case, and such further evidence and argument as the Court may permit.

Dated: November 1, 2021          Respectfully submitted,

                                 TRACY L. WILKISON
                                 Acting United States Attorney

                                 CHRISTOPHER D. GRIGG
                                 Assistant United States Attorney
                                 Chief, National Security Division

                                 _____/s/_____
                                 LAUREN RESTREPO
                                 Assistant United States Attorney

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

1

**TABLE OF CONTENTS**

2 DESCRIPTION                                                          PAGE

3 TABLE OF AUTHORITIES...............................................ii

4 MEMORANDUM OF POINTS AND AUTHORITIES...............................1

5 I.   INTRODUCTION..................................................1

6 II.  DEFENDANT'S CRIMINAL CONDUCT.................................1

7        A.   Defendant's Cyberstalking and Threats to Victim 4.........2

8        B.   Defendant's Cyberstalking and Threats to Numerous
              Other Victims........................................4

9
         C.   Defendant's Witness Tampering and Threats to Kill If
10            Victims Reported Him.................................8

11       D.   Harm to Victims......................................8

12 III. APPLICABLE GUIDELINES RANGE AND PRESENCE INVESTIGATION
          REPORT....................................................9
13
         A.   Four-Level Enhancement for Threatened Use of a Deadly
14            Weapon and a Pattern of Activity Involving Same Victim...11

15       B.   Two-Level Upward Adjustment for Obstruction of Justice...11

16       C.   A Two-Level Downward Variance is Appropriate in this
              Case.................................................13
17
18 IV.  GOVERNMENT'S SENTENCING RECOMMENDATION......................13

         A.   The Nature, Circumstances, and Seriousness of the
19            Offense, and the Need to Provide Just Punishment,
              Warrant a Meaningful Custodial Sentence..................13
20
         B.   The History and Characteristics of Defendant Support a
21            Within Guidelines Sentence...........................15

22       C.   General and Specific Deterrence and the Need to
              Promote Respect for the Law also Warrant a Guidelines
23            Sentence.............................................18

24       D.   A Significant Sentence Is Needed to Protect the
              Victims and the Public...............................18
25
         E.   A $15,000 Fine is Appropriate........................20
26
27 V.   STIPULATION AND ORDER OF REMOVAL............................20

28 VI.  CONCLUSION..................................................21

i

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                PAGE

**CASES**

Gall v. United States,
     552 U.S. 38 (2007)...........................................16

United States v. Carty,
     520 U.S. 984 (9th Cir. 2008)................................16

United States v. Morias,
     670 F.3d 889 (8th Cir. 2012)................................16

United States v. Sindoni,
     510 Fed App'x 906 (11th Cir. 2013)..........................16

**STATUTES**

18 U.S.C. § 3553(a)..............................................13

**OTHER AUTHORITIES**

USSG § 2A6.2(a)..................................................10

USSG § 2A6.2(b)..............................................10, 11

USSG § 3C1.1.............................................10, 12, 13

USSG § 3E1.1.....................................................10

USSG § 5K2.13....................................................16

USSG § 5E1.2.....................................................20

ii

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3     Throughout much of 2019 and 2020, defendant Samuel Trelawney

4 Hughes ("defendant") persistently stalked, harassed, and sent death

5 threats to numerous victims who defendant believed had somehow

6 wronged him.  Defendant used his computer skills to terrorize these

7 victims and their families with harassment and death threats from

8 anonymized accounts.  His use of anonymizing techniques and planning

9 allowed him to avoid identification -- and punishment -- for months

10 while he continued his online harassment campaigns.  Defendant's

11 conduct traumatized the victims, putting many in fear for their lives

12 and the lives of family members.  Some feared going to work or even

13 leaving their homes.  Defendant's conduct was harmful, destructive,

14 and warrants a meaningful custodial sentence.

15     The government respectfully requests that the Court impose the

16 following sentence: (a) a within-Guidelines sentence of 37 months'

17 imprisonment on all counts, to be served concurrently; (b) three

18 years' supervised release on all counts, to be served concurrently;

19 (c) a $15,000 fine; and (d) a mandatory special assessment of $300.

20

## II.   DEFENDANT'S CRIMINAL CONDUCT

21     As set forth in detail in the Complaint ("Compl.") (Dkt. 1),

22 Indictment (Dkt. 11), Plea Agreement (Dkts. 20, 33), and Presentence

23 Investigation Report ("PSR") (Dkt. 36), this case involves

24 defendant's repeated cyberstalking, harassment, and threats to at

25 least ten victims (collectively, "the victims")[1] between April 2019

26

27     [1] The victims were referenced in the Indictment using
pseudonyms.  The Government's Sentencing Position follows the same
28 method used in the Indictment of referring to the victims as Victims
1-10.

1

and June 2020.  During this time, defendant sent dozens of messages via numerous anonymized email and social media accounts, as well as several anonymous letters to the victims' homes and offices, that threatened to injure, rape, or kill each of the victims.  Despite being contacted by both the FBI and state law enforcement officers on multiple occasions regarding his threatening communications, defendant continued to send messages and letters threatening to injure, rape, or kill victims who reported his threats to the police.  Defendant repeatedly warned the victims that contacting the police would lead to the injury or death of the victim or the victims' loved ones.

**A.   Defendant's Cyberstalking and Threats to Victim 4**

As outlined in the Complaint, PSR, and Plea Agreement, beginning in October 2019, defendant began an extensive cyberstalking campaign targeting Victim 4 after meeting her at a writing workshop in Los Angeles.  (Compl. ¶ 32; PSR ¶¶ 16-31; Plea Agreement ¶ 15.)  After the workshop, defendant asked to meet with Victim 4 again and began commenting on Victim 4's Instagram posts, complimenting her appearance.  When Victim 4 blocked defendant's account and declined to meet with him, defendant decided to get "payback" and proceeded to mercilessly stalk Victim 4 online.  His conduct included a number of different techniques and methods to stalk and harass Victim 4 while simultaneously endeavoring to hide his identity.  For example, defendant began following Victim 4 on Instagram using a different Instagram account.  After Victim 4 blocked defendant's second Instagram account from viewing her posts, defendant posted a negative review on the Facebook page for Victim 4's business.  Defendant also

posted a public message on Instagram that included a photo of Victim 4 with the text "cunt" placed across Victim 4's face.

When Victim 4 asked defendant to stop contacting her and told him that she was saving his messages to provide to law enforcement, defendant escalated his threats and harassment by sending graphic horrifying messages to Victim 4 via numerous anonymous accounts. Many of these threats are detailed extensively in the PSR and the factual basis of the Plea Agreement.  (See PSR ¶¶ 16-31; Plea Agreement ¶ 15.)  For example, in one anonymous message defendant told Victim 4:

> You are a diabolical motherfucking cunt, and someone
> I can guarantee will come out and first bash you[r]
> head in, rape you slash your throat and burn your car
> and house. You brought this on yourself and it aint
> going to stop not even a damn stinking police report
> will put an end to your wrath . . .

(PSR ¶ 24.) Defendant's campaign soon extended to threatening Victim 4's family and sending messages to Victim 4's friends and work colleagues.  For example, in one message, sent from another anonymized account, defendant told Victim 4:

> Don't ever report any threats to the police they wont
> help you and that makes me more likely come after you
> and your family. I hope when I see you, I rape you,
> slash your throat and pour gasoline over your half
> mutilated body while you regret being a little
> childish bitch . . . I urge you take it seriously,
> either way you are gonna die, youre going to pay...

(PSR ¶ 26.)

Escalating further, and using yet another anonymous account, defendant sent an email to a colleague of Victim 4 in which defendant accused Victim 4 of being a "meth-addicted child molester."  (PSR ¶ 27.)

1    Defendant's threats were chilling, graphic, and sent with the

2  explicit intention of terrorizing Victim 4.  Indeed, in emails

3  written to his aunt around this same time, defendant admitted he was

4  "continually send[ing] anonymous death threats" to victims and

5  "sending threatening sweary abusive emails to [several women] as a

6  form of payback."  (Ferguson Declaration ("Decl.") ¶ 7.)  He also

7  justified his behavior, saying "[i]t makes me feel better after doing

8  it. . . I'm a different more confident person after my karma

9  release."  (Id.)

### B.   Defendant's Cyberstalking and Threats to Numerous Other Victims

12    Victim 4 and her friends and family were not defendant's only

13  victims during this time period.  Around the same time that defendant

14  was terrorizing Victim 4, he was also threatening numerous other

15  victims throughout the Los Angeles area who he believed had somehow

16  wronged him.  Defendant's cyberstalking campaigns against the nine

17  other victims named in the indictment are detailed extensively in the

18  Complaint, Indictment, and PSR.  (See Compl. ¶¶ 14-31, 34-36; PSR

19  ¶¶ 49-76.)

20    As with Victim 4, defendant's harassment followed a pattern,

21  whereby he met a victim (usually a woman) at a networking event or at

22  work and, after the initial contact, he would send messages seeking

23  further social interaction with the victim.  When the victim did not

24  reciprocate defendant's desire for further contact, defendant would

25  retaliate, researching the victims online and sending numerous death

26  threats to the victims from anonymous online accounts used to

27  disguise his identity.  (PSR ¶ 17.)

28

Defendant's cyberstalking campaigns of the victims were often menacing, malicious, and relentless.  The below excerpts are just a few examples of the messages that defendant sent to some of the victims:

 o <u>Victim 1</u>: After meeting Victim 1 at a networking event, and after Victim 1 told defendant she was not interested in going on a date, defendant sent her multiple threatening messages from anonymous accounts, including the following:

> [Victim 1], Why the fuck haven't you replied to my last email, you know I am going to cut out your throat and I mean it if I see you around. You ugly small minded miserable idiotic cunt I am coming to get you, I will enjoy every moment of killing you . . . .

(PSR ¶ 51.)

 o <u>Victims 3 and 5</u>: After defendant sent threatening communications to a person he met at a networking event hosted by Victims 3 and 5's company, and after both Victim 3 and Victim 5 told defendant that he was banned from future events, defendant posted negative reviews on the Facebook page of Victim 3's business and sent numerous anonymous threatening messages to both victims, including the following:

> I will bash your fucking lights out [Victim 3] you big fat ugly cunt. And Cut your throat open! You are on my waiting list. Thats ya warning I can guarantee you will die soon . . .

(PSR ¶ 58.)

> Hey [Victim 5] you Chinese cunt!!! I am making my inquiries to see if you have died yet, because if you haven't I will rip out your fucking throat, stab you in the eyes and don't think I wont do it because I know where you work and you will regret what you did for the rest of your life, and same with your family . I will kill your lioved ones if you even contact the police about it. You chinese cunt you fucking piece of shit!!!!!

(PSR ¶ 62.)

5

1      o  <u>Victim 9</u>: After meeting defendant at a networking event,

2  Victim 9 asked defendant to move seats because he was making her

3  uncomfortable.  In response, defendant sent the victim numerous

4  anonymous threatening messages, including a message to Victim 9's

5  employer which stated:

6          Fuck You, fuck your matchmaking service I will be sure
            to drop by and stab you to death and anyone who tries
7          to stop me before I put a grenade in your wounds and
            finish you off, and bomb your office! You will die for
8          your stupidity I can guarantee you and I will kill your
            loved ones if you notify the authorities.

9

10  (PSR ¶ 70.)

11    As the above messages show, defendant's campaigns against the

12  victims would often expand to the victims' families and work

13  colleagues.  Below are just a few of the other anonymous death

14  threats that defendant sent to other victims:

15      o  <u>Victim 6</u>: "Hello [Victim 6] you fucking massive child. I

16  know where you fucking live . . . You won't know who this comes from

17  and trust me, it will never land me in jail to threat you and soon

18  carry it out for real. So don't bother with police action, because I

19  will kill your loved ones by cutting their throat and burning their

20  corpse in front of you."  (PSR ¶ 64.)

21      o  <u>Victim 7</u>: "You are fucking vile you are a disgusting woman

22  and I can tell I will come over to your office, and cut your fucking

23  throat out and stab you . . . I know where you are and where to get

24  my gang to kill your members. Fuck you you cunt, theres no point

25  informing authorities before if you do I will kill your loved ones. .

26  ." (PSR ¶ 67.)

27      o  <u>Victim 8</u>: "[Y]ou will die very soon in the most painful

28  agonising death . . . I know who you are and I know where to find

you, and I ask you don't notify the police or anyone because I will

kill your loved ones as well."  (PSR ¶ 68.)

        o  <u>Victim 10</u>:  After Victim 10's husband responded to messages

that defendant sent to his wife, defendant obtained the husband's

telephone number and sent the following message: "You are a fucking

cunt [Victim 10]. You[r] husband is a fucking motherfucker who

deserves to die like you should."  (PSR ¶ 76.)

    A search and review of defendant's phone and computer after his

arrest showed a disturbingly methodical approach to committing his

crimes, including numerous internet searches for the terms: "death

threats," "cut someone's throat," "what should you do if someone

threatens to kill you and your family," "threats to cut someone's

throat," "what happens after someone's throat is cut," "threats to

kill over reporting to the police."  (Ferguson Decl. ¶ 8.)  The

review also revealed numerous searches for several victims' names, as

well as at least one victim's telephone number and home address.

(<u>Id.</u>)

    Knowing that what he was doing was harmful, disturbing, and

illegal, defendant employed numerous techniques to hide his identity,

including creating fake email and social media accounts to send

threats to the victims.  In some messages, defendant even wrote the

letters and messages as if they were coming from a third person, in

an attempt to avoid identification.  For example, in a letter to

Victim 5, defendant wrote:

> It has come to my attention you had banned someone I
> know very well from [Company A] when he had been going
> through a rough time and I have decided to write to you
> anonymously to inform you that I am going to end your
> life. I will rip your fucking throat out and stab you
> in the eyes and put gasoline over your half mutilated
> body. I will also go and end the lives of your fucked

up cunt ass loved ones who brought you up to treat
others like shit you brought this on yourself you
Chinese pancake faced cunt go back to china and don't
be a [Company A] manager ever again you will get this
until you change!!!

(PSR ¶ 60.)

By the time of his arrest, defendant had sent dozens of
anonymous terrorizing messages and death threats to his victims,
including those listed in the Indictment. (PSR ¶¶ 16-31, 49-76; Dkt.
11 (Indictment).)

### C. Defendant's Witness Tampering and Threats to Kill If Victims Reported Him

Prior to being arrested in this case, defendant was contacted on
numerous occasions by local law enforcement and the FBI regarding his
online stalking and threats of different victims.  (PSR ¶ 18.)  But
even contacts with law enforcement were not sufficient to deter
defendant from continuing his online crusade.  In response, defendant
only escalated his conduct.  As shown in the threats outlined above
and in the PSR, defendant attempted to obstruct the administration of
justice by repeatedly threatening to injure or kill the victims and
their family if they ever reported him or went to the police.  (See,
e.g., PSR ¶¶ 24-26, 52, 61-63, 67-68.)

### D. Harm to Victims

As set forth in the Complaint and PSR, and as anticipated in the
victim's impact statements, defendant's conduct was traumatizing for
many of the victims and left them emotionally distraught.  Moreover,
defendant sent messages to several victims' employers and posted
defamatory reviews on some victims' online business pages, thereby
potentially jeopardizing their businesses and reputations.  This was
by design.  As defendant told Victim 4 in one message, "I hope my

8

reviews of you have destroyed your reputation." (PSR ¶ 28.)  On a daily basis during this time period, several victims not only feared for their personal and professional relationships, but also feared for their physical safety.  What is more, defendant expanded his campaigns to harass and threaten the victims' family and friends. Indeed, he not only threatened to brutally kill each of the victims, but he also threatened to kill many of their family members.  In doing so, defendant destroyed the victims' and their families' sense of privacy and security.

For example, Victim 1 stopped attending events in her area for fear of running into defendant, was afraid to go to work, and even considered moving.  (Compl. ¶ 24(f), (k).)  After receiving an anonymized letter from defendant in which he threatened to wait outside her office with a knife or gun and threatened to send his "boys" to rape her, Victim 10 said she was in fear for her life and was fearful for her family's safety.  (Compl. ¶ 36(a).)  Some victims sought to obtain restraining orders in an attempt to protect themselves and make the continuous harassment stop.  (Compl. ¶¶ 32(s), 34(g).)  Defendant's conduct was manifestly harmful and specifically designed to cause the victims anxiety and distress.

**III. APPLICABLE GUIDELINES RANGE AND PRESENTENCE INVESTIGATION REPORT**

For his conduct, defendant was charged in a 26-count indictment for cyberstalking, witness tampering, and sending threats.  In October 2020, the defendant pled guilty, pursuant to a plea agreement, to Counts 5, 10, and 11 of the Indictment, related to his stalking and threats to Victim 4.  (Dkt. 20.)

On April 20, 2021, the USPO disclosed the PSR and its recommendation letter.  (Dkt. 35 (Recommendation Letter); Dkt 36.)

The USPO found that defendant's Total Offense Level was 21, based on the following calculations:

| | | |
|---|---|---|
| Base Offense Level<br>(18 U.S.C. § 2261A(2)(A)): | 18 | USSG § 2A6.2(a) |
| Specific Offense Characteristics:<br>Threatened Use of a Weapon | +2 | USSG § 2A6.2(b)(1)(D) |
| Pattern of Activity Involving<br>Stalking, Threatening Same<br>Victim | +2 | USSG § 2A6.2(b)(1)(E) |
| Role Adjustments:<br>Obstruction of Justice | +2 | USSG § 3C1.1 |
| Acceptance of Responsibility: | -3 | USSG § 3E1.1(a),(b) |

The government concurs with the USPO's calculation of a Total Offense Level of 21 and a Criminal History Category of I, which corresponds to a Guidelines range of 37-46 months' imprisonment. However, in accordance with the terms of the plea agreement and as noted in the PSR, the government recommends the Court apply a two-level variance, resulting in a total offense level of 19 and a Guidelines range of 30-37 months.  (Plea Agreement ¶ 4; PSR ¶ 9.)

For the reasons detailed in this sentencing memorandum, the government recommends a term of imprisonment of 37 months on each count, to run concurrently.  The government concurs with the USPO's sentencing recommendation of a three-year term of supervised release on all counts, to run concurrently, a mandatory special assessment of $300, and a fine of $5,000 for each count of conviction.

The government respectfully requests that the Court adopt the factual findings and calculations of the PSR in this matter and the additional factual information contained in this sentencing position.

**A.  Four-Level Enhancement for Threatened Use of a Deadly Weapon and a Pattern of Activity Involving Same Victim**

The government concurs with the USPO that a two-level enhancement under USSG § 2A6.2(b)(1)(D) applies in this case because defendant's conduct involved threatened use of a dangerous weapon; namely, gasoline.  As defendant admitted in the factual basis of his plea, on November 17, 2019, he sent Victim 4 an anonymous message in which he said he hoped to rape Victim 4, slash her throat, and "pour gasoline over [her] half mutilated body." (Plea Agreement ¶ 15; PSR ¶ 26.)  The next month, on December 8, 2019, defendant sent Victim 4 another message threatening to "cut [her] fucking throat out, sever [her] windpipe and smother [her] in gasoline and light [her] half mutilated corpse."  (Plea Agreement ¶ 15; PSR ¶ 28.)  Thus, this enhancement is supported by the factual basis contained in the plea agreement and admitted to by the defendant at his change of plea.

The government also concurs with the USPO that an additional two-level enhancement under USSG § 2A6.2(b)(1)(E) applies in this case because defendant's conduct involved a pattern of activity involving the stalking, threatening, and harassment of Victim 4, even after defendant was arrested.  This enhancement is acknowledged and agreed to by the parties in the plea agreement and is supported by the factual basis contained in the plea agreement and admitted to by defendant during his change of plea.

Thus, taken together, a four-level enhancement under Section 2A6.2(b)(1) is appropriate.

**B.  Two-Level Upward Adjustment for Obstruction of Justice**

The government concurs with the USPO that a two-level upward adjustment under USSG § 3C1.1 applies in this case because defendant

11

willfully attempted to obstruct or impede the administration of justice with respect to the investigation, prosecution, or sentencing of the offenses of conviction.  Here, defendant pleaded guilty to witness tampering, in violation of 18 U.S.C. § 1512(b)(3), related to his threats to Victim 4.  Specifically, on November 19, 2019, defendant told Victim 4, "[d]on't ever report any threats to the police they wont help you and that makes me more likely come after you and your family."  (Plea Agreement ¶ 15; PSR ¶¶ 25-26, 42.) Thus, this enhancement is supported by the factual basis contained in the plea agreement and admitted to by the defendant at his change of plea.

Moreover, as detailed in the PSR, defendant made similar threats to numerous other victims.  (See, e.g., PSR ¶¶ 61-63, 67-68, 70, 72.) For example, in January 2020, defendant told Victim 6, "[d]ont even think of getting the police involved because I will kill your fucking family and it will be your fault."  (PSR ¶ 63.)  In June 2020, defendant told Victim 10 "if you go to the police on this or try [to have] me jailed I will kill your beloved cunting family of yours. I hope you receive this letter and cringe with fear for the rest of your entire fucking life."  (PSR ¶ 72.)

Indeed, defendant's threats did not stop even after being arrested.  In February 2021, defendant sent a letter to Victim 6 and others from prison in which he warned them to drop the allegations or "horrible things" would happen to them.  (Exhibit ("Ex.") 2 at 1-2.) In the same letter, he also told Victim 6 and others to help him get out of prison or he would "defame" them "indefinitely on social media."  (Ex. 2 at 2.)  For these reasons, a two-level upward adjustment under USSG § 3C1.1 applies.

1      **C.   A Two-Level Downward Variance is Appropriate in this Case**

2           Pursuant to the plea agreement, the government recommends that

3      the Court apply a two-level variance, in recognition of defendant's

4      early acceptance of responsibility, his agreement to save the

5      government and the Court valuable resources and proceed with all

6      hearings via VTC or telephone, and his agreement to waive his

7      appellate rights.  (See Plea Agreement ¶¶ 2(e), 4.)  Applying this

8      two-level variance, defendant's total offense level is 19 and results

9      in a sentencing Guidelines range of 30-37 months' imprisonment.

10     **IV.   GOVERNMENT'S SENTENCING RECOMMENDATION**

11          In accordance with the factors set forth in § 3553(a), the

12     government recommends that the Court impose the following sentence:

13     (a) 37 months' imprisonment on each count, to be served concurrently;

14     (b) three years of supervised release on each count, to be served

15     concurrently; (c) a $5,000 fine on each count, for a total of

16     $15,000; and (d) a mandatory special assessment of $300.  In light of

17     the sentencing factors the Court is required to consider under

18     § 3553(a), defendant's willful, abusive, and repeated conduct

19     warrants nothing less.

20     **A.   The Nature, Circumstances, and Seriousness of the Offense,
21          and the Need to Provide Just Punishment, Warrant a
            Meaningful Custodial Sentence**

22          Stalking is a crime designed to instill fear and terror in its

23     victims.  Cyberstalking is particularly effective in instilling such

24     fear because the attacker cannot be seen and is often anonymous.

25     Unlike traditional stalking, cyberstalkers like defendant attempt to

26     take advantage of the anonymity and relative protection provided by

27     the internet.  When the crime is perpetrated anonymously, as here,

28     the resulting fear and paranoia can be much more acute.  Because the

victim does not know who is stalking them or where their attacker may be, they are constantly fearful and anxious.

Here, defendant's offense was extremely serious and involved the stalking and threats to injure, rape, and murder at least ten victims and their families.  When engaging in this behavior, defendant unquestionably knew what he was doing was wrong.  His actions were purposeful, premeditated, and designed to hide his identity.  As outlined above, defendant created numerous anonymous accounts that he used to threaten the victims.  He sent anonymous letters to the victims at their homes and offices.  Oftentimes, he would post comments about the victims on public-facing websites in an attempt to damage the victims' professional reputations.  The seriousness of defendant's conduct is further underscored by the effect it had on the victims, as detailed above.

In an email to his family, defendant admitted he was "sending threatening sweary abusive emails to [several women] as a form of payback."  (Ferguson Decl. ¶ 7.)  He said he did it because it made him feel better.  (Id.)  Thus, by his own admission, he knew the messages were threatening and abusive but sent them anyway.  Indeed, if defendant didn't believe his behavior was wrong, he would not have taken so many deliberate steps to conceal his identity and hide his electronic footprint, and would not have threatened the victims not to report his conduct to the police.  There thus are several aspects of defendant's conduct that were especially pernicious and warrant a meaningful custodial sentence: (1) its duration and persistence, continuing while he knew that law enforcement was investigating him; (2) the number of victims; (3) the large number and the nature of threats to each victim; and (4) the significant harm, trauma, and

fear he caused to the victims and their families.

**B.   The History and Characteristics of Defendant Support a Within Guidelines Sentence**

The government acknowledges that defendant has no criminal history and suffers from Autism Spectrum Disorder ("ASD"), a condition he has had for many years.  Taking these factors into account, the Government agreed to dismiss 23 of the 26 counts against defendant, which had the effect of reducing defendant's Guidelines range by at least five levels and reducing the defendant's maximum sentencing exposure from 235 years to 30 years.

Moreover, the government concurs with the USPO that defendant has accepted responsibility and a downward adjustment for this acceptance is warranted.  While defendant did not stop his criminal conduct when he was confronted by FBI and local law enforcement, the government believes that these facts are more appropriately considered when deciding the length of sentence within the final Guidelines range.  Indeed, after being arrested in this case, defendant chose to accept responsibility quickly and signed a plea agreement in a prompt fashion.  Since then, defendant's lawyers have been in frequent contact with the government so that defendant could resolve the matter as soon as possible and so that defense counsel could provide important mitigating information to the government.

But while defendant's ASD, lack of criminal history, and early acceptance of responsibility are undoubtedly mitigating factors to be considered at sentencing, they do not support a sentence below the already significantly reduced Guidelines range; rather, they support the government's recommended 37-month sentence.  While the Sentencing Guidelines' recommended ranges are, of course, advisory, when a

sentencing "judge 'decides that an outside-Guidelines sentence is warranted, [they] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" United States v. Carty, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 50 (2007)); see also United States v. Morais, 670 F.3d 889, 893 (8th Cir. 2012) (affirming guideline sentence and rejecting claim that autism diagnosis dictated a sentence variance); United States v. Sindoni, 510 Fed. App'x 906 (11th Cir. 2013) (affirming within-guideline sentence of 200 months for distribution of child pornography finding sentence reasonable despite autism diagnosis, given the seriousness and scope of the defendant's offense conduct).

The facts and circumstances of this case also do not warrant a departure for "diminished capacity" under USSG § 5K2.13 based on defendant's ASD.  The application notes make clear that "significantly reduced mental capacity" means a significantly impaired ability to understand the wrongfulness of the behavior in the charged offense or to control the behavior the defendant knows to be wrong.  USSG § 5K2.13, n. 1.  Moreover, the Guidelines prohibit the departure from being applied where, as here, "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved . . . a serious threat of violence."  USSG § 5K2.13.

Here, defendant has a college degree, has lived independently for years, and has been employed at various times as a computer designer.  (PSR ¶¶ 87-89; 95-96.)  Defendant knew the difference between right and wrong and was fully aware that he was hurting others.  He also knew that he was committing serious crimes and

facing the possibility of imprisonment.  But he continued because, in his own words, he was "justified" in sending the threats and it made him "feel better."  (Ferguson Decl. ¶ 7.)  In the months that followed various contact with law enforcement, defendant had more than adequate time to reconsider his threats and abuse and abandon his attempts at "payback."  But defendant did not stop.  In response, he used techniques to hide his identity from his victims and from law enforcement and continue to send anonymous threats to injure, rape, and kill the victims.  As defendant's emails to his aunt make clear, he knew what he was doing was wrong and was fully aware that he was threatening and abusing other people.  (Ferguson Decl. ¶ 7.)

While defendant's ASD is certainly an important factor to be considered when determining the appropriate sentence in this case, his mental health issues should not be used as a shield to allow defendant to avoid taking responsibility for his deliberate actions. They also cannot excuse or justify his conduct, nor can they lessen the trauma that the victims experienced as a result of his ongoing threats.  Indeed, defendant's numerous letters from prison to both victims and law enforcement demonstrate that defendant has little understanding of the seriousness of his conduct and has only minimal remorse for his actions.  (See Ex. 2 (Letter to Victim 6); Ex. 3 (Letters to Investigators).)

Accordingly, the history and characteristics of the defendant, taken together, support a sentence within the already significantly reduced Guidelines range.

### C.   General and Specific Deterrence and the Need to Promote Respect for the Law also Warrant a Guidelines Sentence

The need for the sentence imposed to promote respect for the law and send an important deterrence message to both defendant and other cyberstalkers or would-be cyberstalkers likewise justifies the imposition of a 37-month prison term.  Here, defendant has a lengthy and established history of stalking, harassing, and threatening people he comes into contact with, without provocation -- whether at networking events, at social gatherings, or at work.  He did so knowing that local law enforcement was investigating him and after being asked by victims to stop.

Moreover, many cyberstalkers like defendant are aware that because they are hiding behind their computers, it is much less likely that they can or will be detected.  These individuals are usually sophisticated, often successful in evading detection, and -- as this case illustrates -- capable of imposing significant real-world harm while sitting behind keyboards and touchscreens.  Many, like defendant, also mistakenly believe that cyberstalking is not a serious crime.  While the Court's sentence must, therefore, communicate a message to defendant, it must also send a signal to the public that such conduct will not be tolerated.  If the punishment that is ultimately meted out is fairly mild, there is a serious risk that cyberstalkers will do a cost-benefit analysis and continue to engage in criminal conduct, undeterred.

### D.   A Significant Sentence Is Needed to Protect the Victims and the Public

Finally, the need for the sentence to protect the victims and the public from further crimes of the defendant further supports the

18

imposition of a 37-month prison term.  While the Court must, of course, consider all of the § 3553 factors at sentencing, the need to protect the public and the victims is of significant concern in this case.  First, as detailed above, despite being contacted by the FBI and local law enforcement on numerous occasions, defendant continued his abusive and threatening conduct.  Moreover, even after spending months in BOP custody, defendant is still attempting to contact the victims from prison.  (See Ferguson Decl. ¶ 4; Ex. 1 (Defendant's Email Requests to Victims); Ex. 2 (Letter to Victim 6).)  His numerous letters to the case agent, the AUSA, and PPD and LAPD detectives further demonstrate that defendant continues to be fixated with the victims and their allegations against him.  For example, as late as September 22, 2021, defendant sent a letter to the LAPD detectives who investigated some of his threats, in which defendant threatened to break one of the detective's jaws if he ever saw her again, and ridiculed Victim 4 for reporting him.  (Ex. 3 at 25-26.) Defendant's letters and continuing attempts to contact the victims demonstrate that there is a serious ongoing risk to the victims and their families.

Additionally, once released, defendant will be deported from the United States to the United Kingdom and the USPO will have a limited ability to closely supervise and monitor him.  Thus, once defendant returns home to England, there will be few conditions or restrictions on his conduct.  Thus, a lenient prison term will not adequately protect the victims, their families, or other members of the public from defendant's online harassment and threats.  Indeed, defendant committed his year-long criminal conduct with the push of a button. And he did so despite many law-enforcement contacts.  Should

1  defendant continue to stalk and harass the victims, proving that

2  defendant is responsible and preventing further harassment could be

3  extremely difficult, particularly given his apparent familiarity with

4  masking his identity online and his presence outside of the United

5  States.  It is clear that a meaningful period of imprisonment is

6  needed to protect the victims and the public from his continuing

7  criminal behavior.

8       **E.   A $15,000 Fine is Appropriate**

9       The fine range for the offenses of conviction is $15,000 to

10 $100,000.  (PSR ¶ 115.)  The government concurs with the USPO that a

11 low-end Guidelines fine of $15,000 -- consisting of $5,000 on each of

12 the counts of conviction -- is appropriate in this case.  Pursuant to

13 USSG § 5E1.2(a), the Court must impose a fine, unless the defendant

14 establishes that he is unable to pay and is not likely to become able

15 to pay.  In this case, defendant has not provided sufficient

16 information regarding his financial situation to establish that he is

17 unable to pay a required fine.

18 **V.   STIPULATION AND ORDER OF REMOVAL**

19      As part of his plea agreement, defendant stipulated and agreed

20 to a judicial order of removal from the United States.  (Dkt. 20,

21 Plea Agreement ¶ 2(i).)  That stipulation, along with a proposed

22 order, was attached as Attachment A to the plea agreement.  (Dkt. 20-

23 1.)  The Court has yet to rule on the parties' stipulation for

24 judicial removal.  At the time of sentencing, the government

25 respectfully requests that the Court consider the stipulation and

26 proposed order of removal.

27

28

## VI.   CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court impose the following sentence: 37 months' imprisonment on each of the counts of conviction, to be served concurrently; a supervised release term of three years on all counts of conviction, to be served concurrently; a $15,000 fine; and the mandatory special assessment of $300.  This recommended sentence reflects the seriousness of defendant's crimes and his history and characteristics, coupled with the profound need to protect the public, promote respect for the law, and afford adequate specific deterrence to defendant and general deterrence to other would-be cyberstalkers like him.